**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JEFFREY LLOYD and LAWRENCE KAUFMANN, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | **Civil Action No. 11 Civ. 9305 (LTS)** |
| v. | |
| JPMORGAN CHASE & CO. and CHASE INVESTMENT SERVICES CORP., | |
| Defendants. | |
| KENNETH CIULLO, individually, and on behalf of all others similarly situated, | |
| Plaintiff, | **Civil Action No. 12 Civ. 2197 (LTS)** |
| v. | |
| JPMORGAN CHASE & CO. and CHASE INVESTMENT SERVICES CORP., | |
| Defendants. | |

---

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION AND
COURT-AUTHORIZED NOTICE PURSUANT TO
SECTION 216(b) OF THE FLSA**

---

**MORGAN, LEWIS & BOCKIUS LLP**
Sam S. Shaulson (SS 0460)
Thomas A. Linthorst (TL 3345)
Blair J. Robinson (Admitted *Pro Hac Vice*)
101 Park Avenue
New York, New York 10178
212.309.6718

*Attorneys for Defendants*
JPMorgan Chase & Co. and
J.P. Morgan Securities, LLC
(as successor in interest to Chase Investment
Services Corp.)

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL BACKGROUND ............................................................................. 4

III.  ARGUMENT ...................................................................................................... 4

    A.    The Court Should Deny Collective Action Certification. ......................... 4

    B.    Determining The Exemptions Applicable To Financial Advisors Will
           Require An Individualized Analysis.......................................................... 8

    C.    Plaintiffs' Efforts To Avoid Their Exempt Job Duties Cannot Be
           Adjudicated On A Collective Basis........................................................... 9

           1.    Since 1949, The Department of Labor Regulations Have Identified
                  Financial Advisors As Exempt From Overtime. ......................... 9

           2.    Plaintiffs And Other FAs Testified That They Engaged In Exempt
                  Financial Advisory Duties Consistent With The Regulations.................... 11

           3.    Just As In Bachrach, The Claims Of CISC Financial Advisors
                  Cannot Be Adjudicated On A Common Basis. ............................ 13

    D.    Plaintiffs And Other Financial Advisors Are Not Similarly Situated With
           Respect To Their Job Duties And Exempt Status. .................................. 14

           1.    Plaintiffs Are Not Similarly Situated To Senior and Independent
                  FAs. ......................................................................................... 15

           2.    Plaintiffs And Other Financial Advisors Are Not Similarly Situated
                  With Respect To Their Job Responsibilities. .............................. 16

            3.    Plaintiffs And Other Financial Advisors Are Not Similarly Situated
                  With Respect To The Relative Importance Of Their Duties........................ 19

            4.    Plaintiffs And Other Financial Advisors Are Not Similarly Situated
                  With Respect To Managerial and Supervisory Duties. .............................. 19

            5.    Plaintiffs And Other Financial Advisors Are Not Similarly Situated
                  With Respect to Compensation. ................................................. 20

            6.    Plaintiffs And Other Financial Advisors Are Not Similarly Situated
                  With Respect to Client Responsibilities. ..................................... 21

            7.    Plaintiffs And Other Financial Advisors Are Not Similarly Situated
                  With Respect To Education, Licenses, and Experience. ............................ 21

            8.    Plaintiffs And Other Financial Advisors Are Not Similarly Situated
                  With Respect to Their Level of Supervision. ............................... 22

            9.    Plaintiffs And Other Financial Advisors Are Not Similarly Situated
                  With Respect to Work Outside The Branch. ............................... 23

**TABLE OF CONTENTS**
(continued)

Page

10. Plaintiffs And Other Financial Advisors Are Not Similarly Situated With Respect to Working With Business Clients ........................................ 24

11. The Varied Experiences Of Financial Advisors Will Require An Individualized Inquiry To Determine Exempt Status ................................. 24

E. Numerous Courts Have Denied Conditional Or Class Certification Of Overtime Claims By Financial Advisors and Others Claiming Misclassification. ............................................................................................ 25

F. None Of The Evidence Or Authority Relied Upon By Plaintiffs Provides A Common Basis To Adjudicate The Overtime Claims Of All FAs. ........................ 26

G. The Court Should Not Send Notice To Those Who Have Arbitration Agreements. ............................................................................................... 28

H. Any Notice Permitted Should Be Limited ................................................ 29

IV. CONCLUSION ................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adair v. Wisconsin Bell, Inc.*,
  2008 WL 4224360 (E.D. Wis. Sept. 11, 2008) ........................................................... 6

*Amendola v. Bristol-Myers Squibb Co.*,
  558 F. Supp. 2d 459 (S.D.N.Y. 2008) ...................................................................... 13

*Amicizia Societa Navegazione v. Chilean Nitrate & Iodine Sales Corp.*,
  274 F.2d 805 (2d Cir. 1960) ................................................................................... 29

*Bachrach v. Chase Investment Services Corp.*,
  2007 WL 3244186 (D.N.J. Nov. 1, 2007) ...................................................... 2, 13, 14

*Bouder v. Prudential Financial, Inc.*,
  2008 WL 7898281 (D.N.J. Mar. 27, 2008) .............................................................. 27

*Brooklyn Sav. Bank v. O'Neill*,
  324 U.S. 697 (1945) ................................................................................................. 3

*Clarke v. JPMorgan Chase Bank, N.A.*,
  2010 U.S. Dist. LEXIS 33264 (S.D.N.Y. 2010) ..................................................... 12

*Clausnitzer v. Fed. Ex. Corp.*,
  248 F.R.D. 647 (S.D. Fla. 2008) ............................................................................. 29

*Colozzi v. St. Joseph's Hosp. Health Ctr.*,
  595 F. Supp. 2d 200 (N.D.N.Y. 2009) ..................................................................... 30

*Davis v. Charoen Pokphand (USA), Inc.*,
  303 F. Supp. 2d 1272 (M.D. Ala. 2004) .................................................................... 7

*Diaz v. Elec. Boutique of Am., Inc.*,
  2005 WL 2654270 (W.D.N.Y. Oct. 17, 2005) ........................................................ 26

*Drake v. Morgan Stanley & Co.*,
  2010 U.S. Dist. LEXIS 47627 (C.D. Cal. Apr. 30, 2010) ....................................... 25

*Espenscheid v. DirectSat USA, LLC*,
  705 F.3d 770 (7th Cir. 2013) ............................................................................... 6, 28

*Guillen v. Marshalls of MA, Inc.*,
  841 F. Supp. 2d 797 (S.D.N.Y. 2012) ............................................................ 7, 26, 27

*Guzelgurgenli v. Prime Time Specials Inc.*,
  883 F. Supp. 2d 340 (E.D.N.Y. 2012) ..................................................................... 30

i

*Handler v. Oppenheimer & Co., Inc.*,
   Case No. BC 343542 (Cal. Super. Ct. Oct. 9, 2007) ................................................ 25

*Hein v. PNC Fin. Servs. Grp., Inc.*,
   511 F.Supp.2d 563 (E.D. Pa. 2007) ..........................................................passim

*Hendricks v. J.P. Morgan Chase Bank, N.A.*,
   263 F.R.D. 78 (D. Conn. 2009).................................................7, 18, 20, 26

*Hoffmann-LaRoche, Inc. v. Sperling*,
   493 U.S. 165 (1989) ......................................................................5, 6, 29

*In re J.T.*,
   716 F. Supp. 2d 270 (S.D.N.Y. 2010) ..................................................... 12

*In re RBC Dain Rauscher Overtime Litigation*,
   703 F. Supp. 2d 910 (D. Minn. 2010)..............................................27, 28

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
   571 F.3d 953 (9th Cir. 2009) ................................................................ 26

*Jackson v. Motel 6 Multipurpose, Inc.*,
   130 F.3d 999 (11th Cir. 1997)................................................................. 7

*Jenkins v. TJX Cos., Inc.*,
   853 F. Supp. 2d 317 (E.D.N.Y. 2012) .................................................... 26

*Kennedy v. Commonwealth Edison Co.*,
   410 F.3d 365 (7th Cir. 2005).................................................................. 19

*Khan v. Airport Mgmt. Servs., Inc.*,
   2011 WL 5597371 (S.D.N.Y. Nov. 16, 2011)....................................26, 27

*Mendoza v. Casa de Cambio Delgado, Inc.*,
   2008 WL 938584 (S.D.N.Y. Apr. 7, 2008) ............................................ 30

*Miguel v. JPMorgan Chase Bank, N.A.*,
   2013 U.S. Dist. LEXIS 16865 (C.D. Ca. Feb. 5, 2013) ......................... 28

*Mike v. Safeco Ins. Co. of Am.*,
   274 F. Supp. 2d 216 (D. Conn. 2003)...................................................3, 26

*Morales v. Plantworks, Inc.*,
   2006 WL 278154 (S.D.N.Y. Feb. 2, 2006) ............................................ 12

*Myers v. Hertz Corp.*,
   624 F.3d 537 (2d Cir. 2010)..............................................................passim

*Newhall v. Chase Home Fin. LLC*,
   2010 U.S. Dist. LEXIS 144750 (M.D. Fla. Dec. 22, 2010) ................... 28

*Perry v. U.S. Bank*,
  2001 WL 34920473 (N.D. Cal. Oct. 16, 2001) ........................................................... 25

*Pippins v. KPMG LLP*,
  2012 U.S. Dist. LEXIS 173918 (S.D.N.Y. Nov. 30, 2012) ......................................... 21

*Piscione v. Ernst & Young, L.L.P.*,
  171 F.3d 527 (7th Cir. 1999) .............................................................................. 19, 21

*Reich v. John Alden Life Ins. Co.*,
  126 F.3d 1 (1st Cir. 1997) ......................................................................................... 21

*Rudd v. T.L. Cannon Corp.*,
  2011 WL 831446 (S.D.N.Y. Jan. 4, 2011) ................................................................... 6

*Ryan v. JPMorgan Chase & Co.*,
  2013 U.S. Dist. LEXIS 24628 (S.D.N.Y. Feb. 21, 2013) ........................................ 3, 28

*Schmidt v. Eagle Waste & Recycling, Inc.*,
  599 F.3d 626 (7th Cir. 2010) ....................................................................................... 9

*Simel v. JPMorgan Chase*,
  2007 U.S. Dist. LEXIS 18693 (S.D.N.Y. Mar. 19, 2007) ............................................ 4

*Spann v. AOL Time Warner, Inc.*,
  219 F.R.D. 307 (S.D.N.Y. 2003) ............................................................................... 29

*Taylor v. Waddell & Reed, Inc.*,
  2012 U.S. Dist. LEXIS 212 (S.D. Cal. Jan. 3, 2012) .................................................. 23

*Torres v. Gristede's Operating Corp.*,
  2006 WL 2819730 (S.D.N.Y. Sept. 29, 2006) ............................................................. 7

*Trinh v. JPMorgan Chase & Co.*,
  2008 WL 1860161 (S.D. Cal. Apr. 22, 2008) ............................................................. 23

*Ubalde v. Prudential Secs., Inc.*,
  No. BC245149 (Cal. Sup. Ct. Nov. 1, 2004) .............................................................. 25

*Vargas v. HSBC Bank USA, N.A.*,
  2012 U.S. Dist. LEXIS 113993 (S.D.N.Y. Aug. 9, 2012) ............................. 4, 13, 20, 26

*Vasquez v. Vitamin Shoppe Indus. Inc.*,
  2011 WL 2693712 (S.D.N.Y. July 11, 2011) .............................................................. 26

*Vinole v. Countrywide Home Loans, Inc.*,
  571 F.3d 935 (9th Cir. 2009) ..................................................................................... 23

*Whitehorn v. Wolfgang's Steakhouse, Inc.*,
  767 F. Supp. 2d 445 (S.D.N.Y. 2011). Notice ........................................................... 29

*Witteman v. Wisconsin Bell, Inc.*,
    2010 WL 446033 (W.D. Wis. Feb. 2, 2010) .................................................. 30

*Wright v. Lehigh Valley Hosp.*,
    2010 WL 3363992 (E.D. Pa. Aug. 24, 2010) .................................................. 8

**STATUTES**

9 U.S.C. §4 .................................................................................................. 28

29 U.S.C. § 251(a)(1), (4), (7) ..................................................................... 5

29 U.S.C. § 255(a) ....................................................................................... 29

**OTHER AUTHORITIES**

29 C.F.R. §301(a) ........................................................................................ 21

29 C.F.R. §541.100 ...................................................................................... 8

29 C.F.R. §541.200 ...................................................................................... 8

29 C.F.R. §541.200(a)(2) ............................................................................. 24

29 C.F.R. §541.203(b) ............................................................................. passim

29 C.F.R. §541.207(d)(2) (1949) ............................................................... 1, 9

29 C.F.R. §541.301 ...................................................................................... 21

29 C.F.R. §541.301(a) .................................................................................. 8

29 C.F.R. §541.601(a) .................................................................................. 8

29 C.F.R. §541.601(c) .................................................................................. 8

29 C.F.R. §541.700 ................................................................................... 16, 23

29 C.F.R. §541.700(a) ............................................................................ 15, 19, 22

29 C.F.R. §541.700(a)(2) .......................................................................... 8, 23

29 C.F.R. §541.700(b) ................................................................................. 16

29 C.F.R. §541.702 ...................................................................................... 9

29 C.F.R. §541.708 ...................................................................................... 9

14 Fed. Reg. 7,723, 7,738 (Dec. 28, 1949) ................................................ 9

14 Fed. Reg. 7,723, 7,730 (Dec. 28, 1949) ................................................ 9

69 Fed. Reg. 21,122, 22,146 (Apr. 23, 2004) ..........................................................................passim

69 Fed. Reg. 22122, 22131 (Apr. 23, 2004) ...............................................................................8

## I.     INTRODUCTION

Plaintiffs are former Financial Advisors ("FAs") or Financial Advisor Associates ("FAAs"), also known as "stockbrokers" or "registered representatives," who have worked for Chase Investment Services Corp. (now J.P. Morgan Securities, LLC) ("CISC").  Plaintiffs allege that they should have been eligible for overtime under the Fair Labor Standards Act ("FLSA") and New York or New Jersey law.  Plaintiffs' motion seeks to certify this case as a collective action under the FLSA and send notice to over 4,000 FAs and FAAs nationwide inviting them to file claims.

Plaintiffs' motion should be denied because it is different than other conditional certification motions.  Plaintiffs' motion comes in the face of almost 65 years of consistent federal regulations from the United States Department of Labor ("DOL") – the agency charged with defining and delimiting the exemptions from overtime – that expressly defined a stockbroker (a "customer's man in a brokerage house") to be exempt from overtime.  29 C.F.R. §541.207(d)(2) (1949).  The DOL has continued and "moderniz[ed]" this definition in the current regulation, which provides:

> Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products.

29 C.F.R. §541.203(b).  The job duties that the DOL has defined as exempt are the same job duties required of FAs by the Financial Industry Regulatory Authority ("FINRA") as a condition of their securities license.  *See* FINRA Rule 2111(a), Suitability (a licensed financial advisor must use "reasonable diligence" to "ascertain the customer's investment profile," including "the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance," and must use that information to develop recommendations for investments that are "suitable for the customer, based on the information obtained") (Linthorst Decl. Ex. A).  In a November 27, 2006 Opinion Letter, the DOL

once again re-affirmed that financial advisors are exempt from overtime.  DOL Opinion Letter, FLSA 2006-43, dated November 27, 2006, 2006 DOLWH LEXIS 57 (Linthorst Decl. Ex. B).  *See also Hein v. PNC Fin. Servs. Grp., Inc.*, 511 F.Supp.2d 563, 570-75 (E.D. Pa. 2007) (finding that a licensed financial advisor was exempt from overtime under the FLSA).  Plaintiffs' motion completely ignores these controlling authorities.

This motion also is different because it represents the second effort by Plaintiffs to certify the overtime claims of CISC FAs.  In *Bachrach v. Chase Investment Services Corp.*, 2007 WL 3244186 (D.N.J. Nov. 1, 2007), Plaintiff Kaufmann (a Plaintiff in this case) moved for class certification of the overtime claims of CISC FAs and submitted declarations by other FAs (including Alan Krichman, an Opt-In in this case), alleging that their primary duty was selling financial products.  Judge Martini compared the exempt job duties described in the DOL's regulation with the testimony of CISC FAs and concluded that "[t]his is precisely what the class members do."  *Id.* at 1.  Judge Martini denied class certification because "the law strongly suggests that the members were not entitled to overtime.  Proving otherwise would require individual exploration of each member's specific work habits."  *Id.* at 3.  Just as in *Bachrach*, Plaintiffs here have disavowed that they performed exempt financial advisory duties in nearly identical declarations that simply parrot legal conclusions.  Just as in *Bachrach*, numerous other CISC FAs have testified that they spent most of their time performing exempt financial advisory duties.  And just as in *Bachrach*, determining whether each FA is exempt from overtime "would require individual exploration of each member's specific work habits."  *Id.*

This motion also is different because, even more than in *Bachrach*, other FAs in this case have testified to performing a wide variety of individual duties disclaimed by the Plaintiffs that are material to the overtime exemptions at issue in this case.  Some FAs have advanced degrees and certifications in finance, economics, or financial planning, some FAs manage clients who have hundreds of millions of dollars in assets under management, some FAs supervise the work of other employees, some FAs

regularly perform their duties outside the branch, and some FAs were paid hundreds of thousands of dollars per year.  Although Plaintiffs were particularly unsuccessful as FAs and earned as little as $30,000 a year, they seek to join FAs in this case who were paid hundreds of thousands of dollars per year, even up to more than $800,000 in a single year.  Plaintiffs seek to enrich themselves and the highly-compensated financial advisors they purport to represent by claiming protection under legislation that has as its "prime purpose . . . to aid the unprotected, unorganized and lowest paid of the nation's working population . . . ."  *Brooklyn Sav. Bank v. O'Neill*, 324 U.S. 697, 707 n.18 (1945).

   This motion also is different because Plaintiffs offer no common proof to adjudicate the overtime status of all FAs nationwide.  Plaintiffs seek to prove that their primary duty was "sales" by relying upon a "common job description" that makes no reference to any such duty, and instead describes exempt duties that Plaintiffs disclaim.  Lloyd Dep. Ex. 12 (as an FA, "[y]ou will . . . identify client needs, analyze customer information, define investment goals, build plans and make recommendations for clients to achieve their investment goals and objectives through individual investment strategies while meeting your asset and revenue targets").  *See Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 221 (D. Conn. 2003) (denying conditional certification of overtime claims alleging misclassification in part because "Mike does not rely on Safeco's job description as evidence in support of his claim; in fact, Mike expressly disavows this job description…").

   Finally, this motion is different because over 2,000 of those that Plaintiffs seek to join have agreed in arbitration agreements with class waivers not to file claims in this case.  Most of those agreements are the same form of agreement this Court recently enforced in *Ryan v. JPMorgan Chase & Co.*, 2013 U.S. Dist. LEXIS 24628 (S.D.N.Y. Feb. 21, 2013) (appeal filed).  The Federal Arbitration Act ("FAA") mandates that those agreements be enforced and does not permit the Court to induce the breach of those agreements by inviting the filing of covered claims in this case.

   For these reasons, Defendants respectfully request that the Court deny Plaintiffs' motion.

## II.   FACTUAL BACKGROUND

CISC is a registered investment advisor regulated by the Securities and Exchange Commission ("SEC"), and a broker-dealer registered with FINRA.  Emmert Decl. ¶3.[1]  CISC employs at least four different levels of financial advisors – Financial Advisor Associates, Financial Advisors, Senior Financial Advisors, and Independent Financial Advisors.  Carroll Decl. ¶3.  Since January 1, 2009, CISC has employed over 4,000 individuals in these roles in hundreds of different locations nationwide.  Isner Decl. Ex. A.  Plaintiffs' Motion only makes reference to two of these – FAAs and FAs.  Pls' Br. at 5.  This is for good reason as none of the Plaintiffs or Opt-Ins ever were Senior FAs or Independent FAs and, therefore, lack standing to certify a class involving positions they never held. *See Simel v. JPMorgan Chase*, 2007 U.S. Dist. LEXIS 18693, *16 (S.D.N.Y. Mar. 19, 2007) (plaintiff could not represent financial advisor trainees when he had never held such position); *Vargas v. HSBC Bank USA, N.A.*, 2012 U.S. Dist. LEXIS 113993, *7 (S.D.N.Y. Aug. 9, 2012) (citing *Simel*).

CISC FAs and FAAs are licensed professionals, required to hold at least four different licenses – the Series 7, Series 63, Series 65 or 66, and insurance – and many have a variety of advanced degrees and certifications that allow them to engage in additional financial advisory responsibilities. Lloyd Dep. Ex. 12; Linthorst Decl. Ex. C (purpose of the Series 7 is to "safeguard the investing public by helping to ensure that General Securities Representatives are competent to perform their jobs").

## III.   ARGUMENT

### A.   <u>The Court Should Deny Collective Action Certification.</u>

Plaintiffs invite the Court to decide their motion and send notice of this case to thousands of individuals under a meaningless standard that would result in conditional certification in every case alleging misclassification.  The statute, authority from the Supreme Court and Second Circuit, and the interests of judicial efficiency and due process call for a more meaningful standard – one that

---

[1]     Ms. Emmert's declaration and all other witness declarations are attached to the Declaration of Thomas A. Linthorst ("Linthorst Decl.") filed in support of Defendants' Opposition, as exhibits J-Z.

qualitatively assesses whether, based on the record to date, the claims of the Plaintiffs and those they seek to join are all bound together by a <u>common</u> <u>factual</u> <u>nexus</u> of <u>unlawful</u> conduct such that their claims for overtime can be adjudicated on a common basis.

Sixty years ago, in response to a flood of "representative" litigation, Congress amended the FLSA to <u>limit</u> the ability of employees to proceed collectively.  Under the title of "Representative Actions Banned," Congress amended the FLSA to preclude representative actions, and limit FLSA actions to similarly situated individuals who have filed a consent to join the case.  Congress also imposed a two-year statute of limitations where none had existed previously, and provided that the filing of an action does not stop the running of the statute unless and until an individual files a consent to join.  Pub. L. No. 52-49, secs. 5-7, 1947 U.S.C. Cong. Serv. 85.  Congress amended the statute because the explosion of FLSA litigation threatened to "bring about financial ruin of many employers and seriously impair the capital resources of many others," and, in the absence of these limitations, "employees would receive windfall payments" and "the courts of the country would be burdened with excessive and needless litigation . . . ."  29 U.S.C. § 251(a)(1), (4), (7); *see also Hoffmann-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 173 (1989) ("The relevant amendment was for the purpose of limiting private FLSA plaintiffs to employees who asserted claims in their own right and freeing employers of the burden of representative actions.").

The Supreme Court has authorized district courts to exercise discretion to send notice only "in appropriate cases."  *Hoffman-LaRoche*, 493 U.S. at 169.  The Court cautioned, however, that this discretion is not "unbridled," and that although "Court intervention in the notice process for case management purposes" is an appropriate use of the Court's power, "the solicitation of claims" is not, and "courts must be scrupulous to respect judicial neutrality."  *Id.* at 174.  In *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010), the Second Circuit affirmed the denial of Rule 23 certification of overtime claims in a misclassification case, and declined to take appellate jurisdiction to disturb the

district court's denial of conditional certification under the FLSA.  *Id.* at 542.  Like the Supreme Court, the Second Circuit cautioned that even the first-stage conditional certification analysis is not non-existent and the factual showing, even if modest, must still be based on some substance and not mere "unsupported assertions."  *Myers*, 624 F.3d at 555.

The touchstone for conditional certification is judicial efficiency.  *See Hoffman-LaRoche*, 493 U.S. at 170.  If the Court must adjudicate the claims of each FA individually, judicial efficiencies will not result.  *See Rudd v. T.L. Cannon Corp.*, 2011 WL 831446, at *6 (S.D.N.Y. Jan. 4, 2011) (courts must be "mindful of the potential burdens associated with defending an FLSA claim involving a large and broadly defined collective group of plaintiffs") (citing *Adair v. Wisconsin Bell, Inc.*, 2008 WL 4224360, at *4 (E.D. Wis. Sept. 11, 2008) ("It would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action…")).

As Judge Posner ruled recently in writing for a unanimous panel of the Seventh Circuit, ultimately the standards for certification under the FLSA and Rule 23 are the same because both are intended to promote judicial efficiency.  *See Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 772 (7th Cir. 2013) ("[T]he provisions of Rule 23 are intended to promote efficiency as well . . . and in that regard are as relevant to collective actions as to class actions.").

Plaintiffs bear the burden of making a sufficient <u>factual</u> <u>showing</u> that they and the purported class were "similarly situated" as "victims of a common policy or plan <u>that</u> <u>violated</u> <u>the</u> <u>law</u>."  *See, e.g., Myers*, 624 F.3d at 555 (emphasis added).  A meaningful standard that considers the evidence in the record to date is particularly appropriate where there has been substantial discovery conducted. The parties in this case have been conducting fact discovery for over six months.  Linthorst Decl. ¶5. The parties have had an opportunity for depositions, and Defendants have produced over 70,000 pages of documents and responded to Plaintiffs' interrogatories.  *Id.*  "The rationale for the 'fairly lenient

standard' . . . disappears, however, once plaintiffs have had an opportunity to conduct discovery with respect to defendant's policies and procedures." *Davis v. Charoen Pokphand (USA), Inc.*, 303 F. Supp. 2d 1272, 1276 (M.D. Ala. 2004); *see also Hendricks v. J.P. Morgan Chase Bank, N.A.*, 263 F.R.D. 78, 83 (D. Conn. 2009) (in reviewing a motion for conditional certification, the court should decide the motion "based on the full evidence before it"); *Torres v. Gristede's Operating Corp.*, 2006 WL 2819730, at *9 (S.D.N.Y. Sept. 29, 2006) (applying heightened scrutiny where motion for conditional certification was filed after discovery occurred).

The fact that the Court can decertify at a later date does not mitigate the harm of sending notice to thousands of individuals without a meaningful review of whether this case could proceed as a collective action.  If conditional certification is granted prematurely, Defendants will be forced to litigate claims potentially numbering into the thousands before any meaningful review of the propriety of collective treatment is conducted.  If it is determined that the case cannot proceed as a collective action, the parties and the Court have wasted a tremendous amount of resources.  *See Guillen v. Marshalls of MA, Inc.*, 841 F. Supp. 2d 797, 803 (S.D.N.Y. 2012) (judicial efficiency would not be served if overly broad class was certified prematurely only for the Court to determine at a later date that collective members were not truly "similarly situated").

Moreover, all of the Plaintiffs and Opt-ins are former employees but authorizing notice has the most significant impact on current employees – turning them into litigation adversaries with their employer, suggesting to them that their employer is violating the law, and jeopardizing their compensation structure under which so many have been so highly compensated.  *See Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1004 (11th Cir. 1997) (premature notice to a nationwide class "surely cause[s] serious and irreparable harm to [defendant]'s reputation and to its relationship with its employees").  As one court aptly noted, applying a minimal and lenient standard to cases, such as this one, where extensive discovery has taken place is an "inefficient and overbroad application of the opt-

in system, . . . places a substantial and expensive burden on a defendant[,] . . . is at odds with the

Supreme Court's recommendation to ascertain the contours of the action at the outset, and . . . [and]

does not comport with the congressional intent behind the FLSA's opt-in requirement, which was

designed to limit the potentially enormous size of FLSA representative actions . . . ."  *Wright v. Lehigh*

*Valley Hosp.*, 2010 WL 3363992, at *3 (E.D. Pa. Aug. 24, 2010).

**B.      Determining The Exemptions Applicable To Financial Advisors Will Require An Individualized Analysis.**

        To evaluate whether the Court should exercise its discretion to authorize notice, the Court

must consider how Plaintiffs' claims will be proven.  *Myers*, 624 F.3d at 548-49.  At least five

separate overtime exemptions under the FLSA may apply to each putative class member:  the

administrative exemption,[2] the professional exemption,[3] the executive exemption,[4] the highly

compensated exemption,[5] and the outside sales exemption.[6]

---

[2]      The administrative exemption requires that an employee have a primary duty that (1) consists of the performance of non-manual work; (2) is directly related to management policies or general business operations of the employer or the employer's customers; and (3) includes the exercise of discretion and independent judgment with respect to matters of significance.  29 C.F.R. §541.200.  The regulations specifically identify those who engage in financial advice as exempt administrative employees.  29 C.F.R. §541.203(b).

[3]      The professional exemption requires:  (1) work requiring advanced knowledge; (2) the advanced knowledge must be in a field of science or learning; and (3) that knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction.  29 C.F.R. §541.301(a).

[4]      The executive exemption requires that the employee must: (1) have a primary duty of "management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;" (2) "customarily and regularly direct[] the work of two or more other employees;" and (3) have "the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."  29 C.F.R. §541.100.  An employee can be exempt where he or she "provides guidance on any one of the specified changes in employment status . . ."  69 Fed. Reg. 22122, 22131 (Apr. 23, 2004).

[5]      The highly-compensated employee exemption applies to any "employee with total annual compensation of at least $100,000" as long as the employee customarily and regularly performs any one exempt executive, administrative, or professional duty.  29 C.F.R. §541.601(a).  The reason for this is obvious:  "A high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties."  29 C.F.R. §541.601(c).

[6]      Defendants dispute that the primary duty of CISC's Financial Advisors was making sales, but even if any particular FA were to prevail on that issue, he or she could still be exempt from overtime under the outside sales exemption, provided that he or she was "customarily and regularly engaged away from the employer's place or places of business . . . ."  29 C.F.R. §541.700(a)(2).

8

Moreover, employees who perform a combination of exempt duties may qualify for exemption.  29 C.F.R. §541.708.  *See also Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 633 (7th Cir. 2010) (account representative was exempt where employee met with clients outside the office to make sales and then spent time in the office developing marketing materials, maintaining a customer database, or performing customer service).  In addition, job duties that are "directly and closely related" to exempt work are considered exempt work.  29 C.F.R. §541.702.

### C.    Plaintiffs' Efforts To Avoid Their Exempt Job Duties Cannot Be Adjudicated On A Collective Basis.

#### 1.    Since 1949, The Department of Labor Regulations Have Identified Financial Advisors As Exempt From Overtime.

Licensed financial advisors (also known over the years as stockbrokers or registered representatives) have always been considered by the DOL to be exempt from overtime.  Almost 65 years ago, the DOL first issued regulations that explained the application of the overtime exemptions "to specific types of situations."  14 Fed. Reg. 7,723, 7,730 (Dec. 28, 1949).  From the outset, the DOL identified a "customer's man in a brokerage house" who "decid[es] what recommendations to make to a customer for the purchase of securities" as exempt from overtime.  29 C.F.R. § 541.207(d)(2) (published in 14 Fed. Reg. 7,723, 7,738 (Dec. 28, 1949)).  That regulation remained in place until 2004, when the DOL adopted the current regulation covering financial services workers found at 29 C.F.R. §541.203(b), but the DOL expressly stated that the new regulation was "consistent with existing section 541.207(d)(2), which provides that 'a customer's man in a brokerage house'" is exempt from overtime and simply "reflects the modernization of this existing subsection for the 21st Century workforce."  69 Fed. Reg. 22,122, 22,146 (Apr. 23, 2004).  The current regulation provides as follows:

> Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial

> circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products.

29 C.F.R. §541.203(b).  The regulation also provides that "an employee whose primary duty is selling financial products does not qualify for the administrative exemption," but by defining the financial advisory duties described above as exempt work, the DOL has excluded such duties from the definition of non-exempt work "selling financial products."

There can be no doubt that licensed financial advisors are precisely the type of position the DOL intended to make exempt with its regulation.  As a condition of obtaining and maintaining their Series 7 licenses, financial advisors must use "reasonable diligence" to "ascertain the customer's investment profile," including "the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance," and must use that information to develop recommendations for investments that are "suitable for the customer, based on the information obtained . . . ."  FINRA Rule 2111(a), Suitability (Linthorst Decl. Ex. A).

A DOL Opinion Letter re-affirmed that financial advisors are exempt from overtime, even where the representative "also bring[s] about the purchase or sale of such investments for their clients and execute[s] the actual transactions that result from their financial advice," and even where they are paid "commissions" based on such transactions and/or fees for assets under management.  Linthorst Decl. Ex. B (DOL Opinion Letter, at *3-6).  *See also* 69 Fed. Reg. 21,122, 22,146 (Apr. 23, 2004) ("[A]s found by the *John Alden*, *Hogan* and *Wilshin* courts, many financial services employees qualify as exempt administrative employees, even if they are involved in some selling to consumers."); *Hein*, 511 F. Supp. 2d at 566 (FA was exempt where he "'cold-called' potential clients, researched investment vehicles, advised clients about appropriate investments,

and was paid a commission on his sales to clients").

### 2. Plaintiffs And Other FAs Testified That They Engaged In Exempt Financial Advisory Duties Consistent With The Regulations.

Plaintiffs Ciullo and Lloyd and Opt-In Strouse have confirmed in deposition testimony that

they performed the financial advisory duties that the Department of Labor had defined as exempt.[7]

For example, Ciullo testified as follows:

> Q. Before making a recommendation to a client or prospective client, did you gather the types of information that's described in Section 7.2 ["essential client information pertaining to the client's financial situation, investment objectives, risk tolerance, [and] anticipated time horizon"]? **A. Yes, I did. I tried to get everything correct.**
>
> Q. Did you review and analyze the information in order to determine what impact that information would have on a suitable recommendation for the client? **A. Yes.**
>
> Q. Did you take that information and determine which investments would best meet the client's needs under their individual financial circumstances? **A. Yes.**
>
> Q. And did you advise the client with respect to the advantages and disadvantages of different investment options? **A. Yes.**
>
> Q. And did you answer any questions that the client had? **A. I tried to, yes.**
>
> Q. And did you help them decide which investment would be best for their individual circumstances? **A. Yes, I did my best.**
>
> Q. And did you do each of those things with all of your Chase clients and prospective clients? **A. Yes.**

Ciullo Dep. 138:22-140:4; *see also* Lloyd Dep. 103:12-106:15, 236:4-20; Strouse Dep. 168:9-

172:16.[8]

In an effort to obscure the fact that Plaintiff performed exactly the job duties that the DOL

has identified as exempt with each and every client and prospective client, in the declarations

submitted in support of their motion, Plaintiffs simply called these duties "selling." *See* Ciullo

Decl. ¶9. This, however, is simply a legal conclusion and an "unsupported assertion" insufficient

---

[7]    Defendants have deposed only those Plaintiffs or Opt-Ins who are not subject to their Motions to Compel Arbitration (Dkt. Nos. 65, 67).

[8]    Relevant exerpts from the Plaintiffs' depositions are attached to the Linthorst Decl. as exhibits D-G.

to warrant conditional certification.  *Myers*, 624 F. 3d at 555.[9]

 The Plaintiff deponents testified that when they referred to "selling," they were referring to

exempt financial advisory duties.  As Plaintiff Ciullo testified:

> Q. In other words, when you say you were selling to a customer, you're describing going
> through that process of gathering and analyzing the information, developing recommendations,
> and discussing the advantages and disadvantages with them?  [Objection]  **A. Yes.**

Ciullo Dep. 253:13-29; *see also* Lloyd Dep. 236:4-237:24; Strouse Dep. 261:20-262:9.[10]

Similarly, Plaintiffs' pre-litigation documents describing their own job duties as CISC FAs also

are inconsistent with their declarations.  For example, in his pre-litigation description of his job

duties, Plaintiff Strouse made no mention of "selling," and instead described his duties as "[a]dvise

clients with intricate investment relationships on asset allocation and portfolio construction with

strategic and tactical strategies."  Strouse Dep. 17:8-14 & Ex. 1.  Each FA's pre-litigation

descriptions of their job duties will be individualized sources of proof material to the exemption

determination.  *See, e.g.*, *Clarke v. JPMorgan Chase Bank, N.A.*, 2010 U.S. Dist. LEXIS 33264,

*53-54 (S.D.N.Y. 2010) (employee exempt from overtime based on plaintiff's "own testimony

and pre-litigation documents (including resumes and performance evaluations)").

 The Plaintiffs deposed each confirmed that CISC FAs are trained and required to go

---

[9] Defendants object to the admission into evidence of the following portions of Plaintiffs'
declarations on the grounds that they are conclusory, lack foundation, and that the declarants lack personal
knowledge of the facts alleged therein.  Lloyd Decl. ¶¶5, 6, 8, 10, 11, 12, 13, 16, 21, 22, 27; Kaufmann Decl.
¶¶5, 6, 7, 9, 10, 11, 12, 13, 14, 17, 22, 23, 29; Hyman Decl. ¶¶5, 6, 8, 10, 11, 12, 13, 15, 20, 21, 26; Krichman
Decl. ¶¶5, 6, 8, 10, 11, 12, 13, 16, 21, 22, 28; Johnson Decl. ¶¶4, 7, 8, 10, 11, 12, 13, 14, 15, 18, 22, 23, 29;
Piccoli Decl. ¶¶5, 6, 8, 10, 11, 12, 13, 16, 19, 20, 26; Strouse Decl. ¶¶5, 6, 8, 9, 10, 11 12, 13, 16, 19, 20, 26;
Zaat-Hetelle Decl. ¶¶6, 7, 9, 10, 11, 12, 13, 16, 21, 22, 28; VanHoogstraat Decl. ¶¶6, 7, 9, 11, 12, 13, 14, 18, 21,
22, 28; Do Carmo Decl. ¶¶5, 6, 8, 10, 11, 12, 13, 16, 19, 20, 26; Spencer Decl. ¶¶5, 6, 8, 10, 11, 12, 13, 16, 19,
20, 26; Fuentes Decl. ¶¶5, 6, 8, 10, 11, 12, 13, 16, 19, 20, 26; Ciullo Decl. ¶¶5, 6, 8, 10, 11, 12, 13, 16, 21, 22,
27.  *See In re J.T.*, 716 F. Supp. 2d 270, 284 (S.D.N.Y. 2010) ("statements that . . . amount to conclusory
legal arguments cannot be considered by the Court").

[10] Plaintiffs' boilerplate, conclusory declarations are insufficient to meet Plaintiffs' burden on
conditional certification.  *Morales v. Plantworks, Inc.*, 2006 WL 278154, at *1 (S.D.N.Y. Feb. 2, 2006)
(conclusory allegations or a lack of a nexus with the putative class preclude moving forward on a collective
action); *see also Hein*, 511 F. Supp. 2d at 572 (granting summary judgment to employer on financial advisor
overtime claims notwithstanding plaintiff's claim "that his primary duty was selling" because the plaintiff's
"characterization" of his duties did not create a factual dispute about what the actual duties were).

through the financial advisory process described above with respect to each client, only made recommendations suitable in the best interests of the client after gathering and analyzing the relevant information, even if such recommendations did not benefit them or CISC by a transaction. Ciullo Dep. 132:19-135:5; Lloyd Dep. 122:6-125:23; Strouse Dep. 85:15-86:5, 169:12-17.

In addition to the Plaintiff deponents, numerous other FAs have testified to performing exempt job duties consistent with the DOL regulations and the Opinion Letter.  Murray Decl. ¶¶7-12; Tenbusch Decl. ¶10; Anderson Decl. ¶¶4, 7; Eppes Decl. ¶¶8-11; Mavromoustakos Decl. ¶¶8, 12-13; Forman Decl. ¶¶10-13; Luckett Decl. ¶4.  As one testified:  "Clients came to me for help in meeting their financial goals.  Some were planning for retirement, others wanted to be able to pay for a college education for their children, and others had other goals that were important to them.  My responsibilities to prepare financial plans and make recommendations to help them meet those goals were very important to the clients."  Cholankeril Decl. ¶17.[11]

### 3.      Just As In *Bachrach*, The Claims Of CISC Financial Advisors Cannot Be Adjudicated On A Common Basis.

The Court need not make a finding on the merits that any CISC FAs are, in fact, exempt from overtime.  It is sufficient for purposes of the present motion to find that the record before the Court reflects that many FAs performed exempt financial advisory duties, as required by FINRA Rules, and that for the Court to determine whether any particular FA did not engage in such duties and instead primarily engaged in rote "selling" would require individualized testimony and evidence.  *Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459, 467 (S.D.N.Y. 2008).

---

[11]      Several Financial Advisors have recently signed declarations testifying to their job duties as CISC FAs.  Plaintiffs argue that the Court should not consider such testimony, but each statement contains a robust acknowledgement that it was voluntarily provided.  It is not surprising that many successful and highly compensated FAs, who enjoy being treated and compensated like a professional, would not support the Plaintiffs' efforts to turn this job into a non-exempt role that would require FAs to punch a clock.  Anderson Decl. ¶15; Mavromoustakos Decl. ¶15.  There is no basis on which to decide this important motion without considering all of the evidence in the record.  *See Vargas*, 2012 U.S. Dist. LEXIS 113993, at *13 ("the Court sees no reason why it should not consider the entire record in determining whether to exercise its discretion to order the sending of a notice to other potential plaintiffs").

That is exactly what Judge Martini found in denying class certification with respect to overtime claims of CISC FAs in *Bachrach*.  The *Bachrach* decision is particularly apt because of the overlap of Plaintiffs and evidence with this case.  Plaintiff Kaufmann's motion in *Bachrach* was supported by his own declaration and those of several other CISC FAs each claiming that they engaged in rote "sales" duties, just like the declarations Kaufman, Krichman, and others have submitted in support of the instant motion.  Linthorst Decl. ¶10.  CISC opposed the motion with testimony from numerous other FAs who testified to the exempt financial advisory duties they performed, including several of the same individuals who have provided testimony in this case.  Linthorst Decl. ¶10.  Comparing the job duties performed by CISC FAs with the DOL's regulation, Judge Martini found that CISC FAs "likely" are exempt from overtime:

> As an example of administrative employees, federal regulations list "[e]mployees in the financial services industry" whose duties include collecting information about customers' finances, preparing a financial plan for their customers, and ultimately selling the plan. 29 C.F.R. § 541.203 (2007). ***This is precisely what the class members do.***

*Id.* at *1 (emphasis added).  Judge Martini then concluded that determining whether each FA engaged in exempt financial advisory duties would require an individualized inquiry and was not suitable for common resolution:  "[T]he law strongly suggests that the members were not entitled to overtime. ***Proving otherwise would require individual exploration of each member's specific work habits***."  *Id.* at *3 (emphasis added).  The same is true in this case – many FAs clearly performed exempt advisory duties and determining whether any FA did not "would require individual exploration of each member's specific work habits."  *Id.* at *3.

### D.   Plaintiffs And Other Financial Advisors Are Not Similarly Situated With Respect To Their Job Duties And Exempt Status.

"The exemption question . . . involv[es] a number of subsidiary questions, each of which may or may not be able to be proven in common with respect to all" FAs.  *Myers*, 624 F.3d at 548.  "Significantly, the regulations make clear that these questions should be resolved by examining the

employees' actual job characteristics and duties." *Id.* (citing 29 C.F.R. §541.2).  To proceed on a class

or collective basis, the case must "involve evidence tending to show that the plaintiffs' jobs were

similar in ways material to the establishment of the exemption criteria." *Id.* at 549.

In addition to numerous subsidiary questions discussed below, the elements of the applicable

exemptions will require the Court to make determinations concerning (1) the amount of time each

individual spent performing each of his or her day-to-day tasks; (2) "the relative importance of the

exempt duties as compared with other types of duties," and (3) "the employee's relative freedom from

direct supervision."  29 C.F.R. §541.700(a).  Plaintiffs offer no common evidence to adjudicate these

and the subsidiary questions set forth below.

### 1.    Plaintiffs Are Not Similarly Situated To Senior and Independent FAs.

CISC employs at least four different levels of financial advisors – FAAs, FAs, Senior FAs, and

Independent FAs.  Carroll Decl. ¶3.  Plaintiffs' and Opt-Ins only were employed in two of these –

FAAs and FAs – and these are the only two positions referenced in their motion.  Pls' Br. at 5.  Apart

from the fact that Plaintiffs lack standing to proceed on behalf of Senior and Independent FAs, they

also are not similarly situated to those roles.

Senior and Independent FAs often manage large numbers of clients and assets, are

compensated under different compensation plans than other FAs, are able to recommend a broader

array of investment options than other FAs, and are very highly compensated.  Bibergal Decl. ¶¶6-7;

Carroll Decl. ¶8; Cohen Decl. ¶12.  Independent FAs generally do not work in branches like the

Plaintiffs did, do not perform many of the duties that Plaintiffs claim (such as participating in morning

huddles or branch activities), and have different supervisors than other FAs.  Lloyd Dep. 281:16-

283:9; Carroll Decl. ¶9.  Whereas the Plaintiffs and Opt-Ins were unsuccessful and generally were

paid less than $50,000 in annual compensation, every Senior FA except one, and the vast majority of

Independent FAs, who worked in the role for an entire year were paid over $100,000 per year.

Bibergal Decl. Ex. A.  In fact, the <u>average</u> annual compensation of such Senior FAs was <u>over $200,000</u>, ranging up to <u>over $1 million</u> in a single year, and Independent FAs averaged annual compensation of over $200,000 for every year except one (in 2009 the average was "only" $197,019), ranging up to over $900,000 in a single year.  Bibergal Decl. Ex. A.  Plaintiffs are not similarly situated to such highly compensated positions.

> **2.     Plaintiffs And Other Financial Advisors Are Not Similarly Situated With Respect To Their Job Responsibilities.**

Although not determinative, one factor the Court will need to consider in determining an employee's exempt status is the amount of time that employee spent on different duties.  29 C.F.R. §541.700.  "Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement."  29 C.F.R. §541.700(b).  Plaintiffs offer no common evidence that FAs spend the same amount of time on the same tasks.  Neither the job description nor the training materials nor their own declarations provide any common directives to FAs on how much time to spend on different tasks, and the testimony and evidence to date demonstrates that the amount of time FAs spend on different tasks varies widely based on a host of individual factors.  *See* Forman Decl. ¶17 ("I have the flexibility to decide how [] best to use my time"); Anderson Decl. ¶12; Williams Decl. ¶5; Cohen Decl. ¶14.

Some FAs claim that they spent as little as 30% of their time meeting with clients and providing financial advice (*see* Ciullo Dep. 255:8-19), but others have testified that they spent 50% or more on such exempt duties.  Strouse Dep. 261:20-24, 277:3-278:18 (spent 50% of his time meeting with clients and prospective clients to provide financial advice and another 20-25% preparing for such meetings); Tenbusch Decl. ¶10 (spent 80% of his time meeting with clients and providing financial advice); Mavromoustakos Decl. ¶10 (spent 60% of his time in client meetings providing financial advice); Forman Decl. ¶14 (80% of his time spent in client meetings providing financial advice and preparing for such meetings); Maciak Decl. ¶¶4-6; Luckett Decl. ¶7; Carroll Decl. ¶¶5-6.

Some FAs claim they "spent very little time advising current customers on their investments because the focus of my job was to sell financial products to new customers," (Kaufmann Decl. ¶10; Hyman Decl. ¶9), but other FAs had the <u>opposite</u> focus.  Mavromoustakos Decl. ¶8 ("My principal responsibility as an FA was to provide financial advice to existing clients"); Cholankeril Decl. ¶12 ("I spent more of my time advising existing clients and managing their investments than a Financial Advisor with less experience who had not yet developed a significant book of business."); Tenbusch Decl. ¶7; Williams Decl. ¶2; Anderson Decl. ¶7; Carroll Decl. ¶¶5-6.[12]

Moreover, the amount of time FAs spend on different job responsibilities changes over time. Some FAs who are just starting out need to spend most of their time attempting to find new clients while more established FAs spend very little time developing clients and most of their time providing financial advice to current clients.  Forman Decl. ¶5 ("Over the last five years, I have spent less time developing clients and more time providing financial advice to our existing clients."); Costine Decl. ¶7; Anderson Decl. ¶¶6, 13; Goblet Decl. ¶11; Carroll Decl. ¶6.

Some FAs do not have anyone to assist them in performing administrative duties such as completing paperwork, setting up appointments, or maintaining files (Lloyd Dep. 281:11-12), but other FAs supervise a financial assistant who handles such responsibilities and, thus, they are able to spend more time providing financial advice to clients.  Cholankeril Decl. ¶22 ("After Chase hired my assistant, I spent far less time doing administrative work."); Williams Decl. ¶4; Cohen Decl. ¶11.

The role of FA is very flexible and some FAs developed job duties for themselves that other FAs did not perform.  Ciullo decided to hold seminars at a seniors' community, Ciullo Dep. 206:22-207:9, Strouse ran contests for bankers to motivate them to identify potential clients for him, Strouse Dep. II 25:12-26:7, some FAs developed advertising in an effort to find clients, Ciullo Dep. 249:25-

---

[12]   Even among the Plaintiffs and their declarants, there is a divide between those who state they split their time new and existing clients (*see, e.g.*, Ciullo Decl. ¶9, Lloyd Decl. ¶9), and those who were focused almost exclusively on developing new clients (*see, e.g.*, Kaufmann Decl. ¶10; Hyman Decl. ¶9).

250:20, and some FAs developed business plans for themselves.  Eppes Decl. ¶4; Luckett Decl. ¶6.

The manner in which FAs perform their duties varies widely as well.  Some FAs regularly use software in helping to develop financial plans for clients and some rarely use the software.  *Compare* Strouse Dep. 214:15-23 (used financial planning with 60-70% of clients and prospective clients), *with* Ciullo Dep. 262:5-17 (used software with less than 10% of client or prospective clients); Cholankeril Decl. ¶14 ("I typically did not use this software.").[13]

Other factors impacted the amount of time that FAs spent on different job duties, including the specific clients at issue,[14] branch clientele and characteristics,[15] whether the FA partnered with other FAs,[16] the number of clients and size of the assets the FA was responsible for,[17] events in the financial markets,[18] and whether the FA had to cover several branches and spent time traveling between them.[19] Plaintiffs have offered no common proof to determine how much time any particular FA spent on different tasks.

---

[13]    Linthorst Decl. Ex. B (DOL Opin. Letter, at *17 n.4) (financial advisors exempt from overtime notwithstanding that they "may utilize computer software and other technology such as asset allocation and portfolio management programs").

[14]    Tenbusch Decl. ¶14 ("Every client was different – their financial situation, their goals, what strategies they might need to consider, and what they were looking for from me all were different."); Forman Decl. ¶13 ("[W]ith each client the process may vary."); Mavromoustakos Decl. ¶10; Cohen Decl. ¶7.  *See Hendricks*, 263 F.R.D. at 86 (denying certification where "different types of fund accounting clients have different needs and consequently request different types of fund accounting services").

[15]    Some FAs had to spend less time finding clients in branches that had an affluent client base or were more busy.  Anderson Decl. ¶5 ("Every branch is different and so the branches I covered affected how I spent my time."); Murray Decl. ¶13; Cholankeril Decl. ¶¶7-9.

[16]    Mavromoustakos Decl. ¶7 ("My partner FA already had an established client base and this allowed me to focus more on providing financial advice to clients earlier in my employment than would otherwise have been the case.").

[17]    Carroll Decl. ¶6 (range of assets under management was between $16 million and $385 million); Mavromoustakos Decl. ¶9 (responsible for managing $280 million together with FA partner); Forman Decl. ¶5 ($130 million); Williams Decl. ¶10 ($125 million); Costine Decl. ¶12 ($100 million).

[18]    Tenbusch Decl. ¶13 ("The amount of time I spent on tasks could change depending on what was going on in the market."); Anderson Decl. ¶6.

[19]    Tenbusch Decl. ¶3 (covered up to 5 different branches); Cholankeril Decl. ¶4; Carroll Decl. ¶13.

**3.    Plaintiffs And Other Financial Advisors Are Not Similarly Situated With Respect To The Relative Importance Of Their Duties.**

An individualized inquiry would need to be made with respect to "the relative importance of the exempt duties as compared with other types of duties," one of the many factors the Court should consider in determining an individual's exempt status. 29 C.F.R. §541.700(a). Some Plaintiffs claim that their managers "pushed [them] and other Financial Advisors to prioritize sales over everything else." Lloyd Decl. ¶11; Kaufmann Decl. ¶12. Other FAs, however, have testified that it was most important for them to provide the best financial advice. Murray Decl. ¶15 ("My primary interest was in helping my clients improve their financial status, even if it did not result in any business for the firm."); Tenbusch Decl. ¶4 ("My primary duty as a Financial Advisor and FAA has been to help clients reach their financial goals"); Forman Decl. ¶9. Whereas Opt-In Picolli claims that he "felt that [he] was a salesman at Chase, and did not have the opportunity to be an advisor" (Picolli Decl. ¶11), other FAs had the <u>opposite</u> experience. *See* Cholankeril Decl. ¶24 ("I did not sell financial investments to Chase clients. Rather, I evaluated each client's situation and recommended investments . . . that best fit the client's needs."); Maciak Decl. ¶10 ("My primary duty was not sales. I have always been an advisor."); Cohen Decl. ¶13.

**4.    Plaintiffs And Other Financial Advisors Are Not Similarly Situated With Respect To Managerial and Supervisory Duties.**

Supervisory responsibilities can be material both to the executive exemption and the administrative exemption. *Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 535-37 (7th Cir. 1999) (supervisory duties such as assigning work, training more junior employees, setting priorities, interviewing, and making recommendations for hiring were exempt administrative duties); *Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365 (7th Cir. 2005) (same).

Although Plaintiffs claim that they "did not supervise or direct the work of any Chase employees," (*see, e.g.*, Lloyd Decl. ¶21), numerous other FAs have testified to having supervisory

responsibilities with respect to other employees.  *See* Cohen Decl. ¶4 (supervised two assistants);

Mavromoustakos Decl. ¶¶4-5 ("During my employment as an FA, I supervised one assistant who

supported me and another FA," including interviewing candidates for the role, assigning work, setting

priorities, and providing performance evaluation and feedback); Forman Decl. ¶¶6-8 (same); *see also*

Williams Decl. ¶4; Carroll Decl. ¶¶10-11; Costine Decl. ¶8.

Some FAs also testified to supervising and directing the work of personal bankers in the

branch.  Lloyd Dep. 150, Ex. 13 ("train[ed] and manag[ed] the branches['] personal bankers"); Strouse

Dep. II 20 & Ex. 24 (directed bankers to complete a report and meet with him to review); Murray

Decl. ¶6; Forman Decl. ¶15; Luckett Decl. ¶5.  *See Hein*, 511 F. Supp. 2d at 568 (financial advisor

was exempt when he "reviewed [the licensed financial consultants'] investment advice to clients,

trained them in sales skills, and taught them how to assess customers' finances and investment goals").

An individualized inquiry would need to be conducted with respect to the supervisory duties

performed by FAs under both the executive and administrative exemptions.  *See Vargas*, 2012 U.S.

Dist. LEXIS 113993, at *4-5 (denying conditional certification where plaintiff denied having

supervisory responsibilities but "[n]umerous other Fund Accountants testified to having supervisory

responsibilities…"); *Hendricks*, 263 F.R.D. at 85 (same).

     **5.**     **Plaintiffs And Other Financial Advisors Are Not Similarly Situated With Respect to Compensation.**

Financial Advisors who were paid at an annual rate of $100,000 or more are exempt from

overtime under the highly-compensated employee exemption (29 C.F.R. §541.601) – an exemption

completely inapplicable to the Plaintiffs and Opt-Ins, who earned significantly less.

Plaintiffs disingenuously claim that "Plaintiffs and opt-ins are also similarly situated with

respect to this exemption because none of them came close to meeting the $100,000 minimum

threshold."  Pls' Br. 16 n.50.  Even excluding the Senior FAs and Independent FAs, Plaintiffs seek to

join hundreds of individuals who were paid more than $100,000 in annual compensation – some of

whom made several hundreds of thousands of dollars, even as much as over $800,000 in a single year. Bibergal Decl. Ex. A.  Plaintiffs are not similarly situated to such highly compensated individuals.

      **6.**    **Plaintiffs And Other Financial Advisors Are Not Similarly Situated With Respect to Client Responsibilities.**

The nature and extent of client responsibilities can be significant to the determination of the administrative exemption.  *See Piscione*, 171 F.3d at 539 (employee was exempt in part due to client responsibilities); *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 5 (1st Cir. 1997) (employees were administratively exempt where they were the primary contact with the customer).

Some Plaintiffs allege that their job duties "involv[ed] very little relationship-building with customers," (Johnson Decl. ¶13, Kaufmann Decl. ¶12), but other FAs have testified to having substantial responsibilities with respect to building relationships with clients.  Anderson Decl. ¶14 ("I was the primary client contact at CISC for these clients"); Forman Decl. ¶18 (same); Cohen Decl. ¶5.

      **7.**    **Plaintiffs And Other Financial Advisors Are Not Similarly Situated With Respect To Education, Licenses, and Experience.**

An individualized inquiry will need to be conducted under the professional exemption as to the qualifications and experience of each FA, and whether they have advanced knowledge acquired by a prolonged course of specialized intellectual instruction, or a combination of education and experience. 29 C.F.R. §301(a).  "[I]n situations in which applicants are required to complete a particular course of instruction directly related to a position, even if they do not have a specific degree, courts have concluded that the 'learned professional exemption' is applicable."  *Pippins v. KPMG LLP*, 2012 U.S. Dist. LEXIS 173918, at *71 (S.D.N.Y. Nov. 30, 2012) (quotation omitted); 29 C.F.R. §541.301 (licensed medical technologists, nurses, and funeral directors qualify for professional exemption).

As noted above, all FAs are required to have four different licenses.  Beyond that, some FAs are high school graduates, while others some have Bachelor's degrees in Finance or Economics, and

still others have Master's degrees in Business Administration.[20]  Others have advanced certifications in financial planning, such as the Certified Financial Planner, Chartered Financial Consultant, or Certified Investment Management Analyst certifications.  Mavromoustakos Decl. ¶¶2, 14 ("As a Certified Financial Planner and Certified Investment Management Analyst, I felt that I provided the clients I managed with an enhanced level of expertise in planning for retirement and creating effective investment strategies."); Forman Decl. ¶¶2-3.

### 8. Plaintiffs And Other Financial Advisors Are Not Similarly Situated With Respect to Their Level of Supervision.

An individualized inquiry would need to be made into the level of supervision to which each FA was subjected.  *See* 29 C.F.R. §§541.700(a) ("the employee's relative freedom from direct supervision" is a factor in determining an employee's primary duty); 541.202(c) (administrative exemption examines whether "employee has authority to make an independent choice, free from immediate direction or supervision").  Again, some Plaintiffs have testified to being "closely supervised," having to meet regularly with their supervisor, or having their supervisor participate in client phone calls or meetings (Kaufmann Decl. ¶20, Johnson Decl. ¶21), but other Plaintiffs did not testify to such close supervision (*see, e.g.*, Lloyd Decl. ¶19), or testified that they had different levels of supervision under different managers (Ciullo Dep. 170:20-22, 176:15-19).  *See also* Carroll Decl. ¶16.  Moreover, other FAs have testified that they had the opposite experience because their supervisors were not involved in their day-to-day activities.  Cholankeril Decl. ¶25 ("I mostly worked with minimal oversight from my Area Manager."); Forman Decl. ¶19 ("[My supervisors] are not involved in my day-to-day activities."); Maciak Decl. ¶13 (supervisor "did not require me to report to her on a regular basis"); Eppes Decl. ¶13.  *See Hein*, 511 F. Supp. 2d at 574 (FA was exempt in part because his supervisor "did not directly supervise him or review his recommendations to clients").

---

[20]     Murray Decl. ¶3 (Masters in Business Administration and 20 years of experience as an FA); Forman Decl. ¶2 (Bachelors in Finance and Certified Fund Specialist); Eppes Decl. ¶2 (no college degree).

9.     **Plaintiffs And Other Financial Advisors Are Not Similarly Situated With Respect to Work Outside The Branch.**

Even if Plaintiffs were able to establish that their primary duties were sales, which they cannot, Defendants could still prevail by establishing that Plaintiffs are subject to the outside sales exemption. 29 C.F.R. §541.700.  That exemption requires that the employee be "customarily and regularly engaged away from the employer's place or places of business . . . ."  29 C.F.R. §541.700(a)(2). Significantly, "the phrase 'customarily and regularly' is not a 'majority of the time' test."  *Taylor v. Waddell & Reed, Inc.*, 2012 U.S. Dist. LEXIS 212, at *11 (S.D. Cal. Jan. 3, 2012).  "The DOL likewise confirmed that selling or sales related activity outside the office '***one or two hours a day, one or two times a week***' satisfied the test for the exemption."  *Id.* (citing DOL Opinion Letter FLSA2007-2, 2007 WL 506575, at 3-4 (Jan. 25, 2007) (emphasis in original)).

Although some Plaintiffs claim that they "very infrequently performed my duties as a Financial Advisor outside of the branches to which I was assigned" (Kaufmann Decl. ¶4), there is no restriction on an FA meeting with clients away from the branch and many FAs customarily and regularly do so.  Ciullo Dep. 119:8-17 (met with clients at their homes or outside the branch "maybe two, three times a week"; "I have no problem going to clients' house or businesses.").  *See also* Eppes Decl. ¶12; Mavromoustakos Decl. ¶11; Williams Decl. ¶6; Carroll Decl. ¶16.

An individualized inquiry would need to be made into how much time each FA spent performing duties outside the branch.  *See Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 947 (9th Cir. 2009) (affirming denial of class certification where "a court evaluating the applicability of the outside salesperson exemption must conduct an individualized analysis of the way each employee actually spends his or her time, and not simply review the employer's job description"); *Trinh v. JPMorgan Chase & Co.*, 2008 WL 1860161, at *4 (S.D. Cal. Apr. 22, 2008) (denying FLSA conditional certification in part due to individualized inquiry into "the amount of time each loan officer worked outside the office").

23

### 10.     Plaintiffs And Other Financial Advisors Are Not Similarly Situated With Respect to Working With Business Clients.

Plaintiffs claim that the extent to which the clients an FA was responsible for are individuals or businesses is material to the exemption determination.  Pls' Br. 15.  Plaintiffs are mistaken,[21] but even if they were correct, an individualized inquiry would have to be made into the clients for which each FA had responsibility.  Some Plaintiffs claim that the clients they were responsible were exclusively individuals, Hyman Decl. ¶6, while others testified that they had some business clients.  Lloyd Decl. ¶6.  Moreover, there is no limitation or common directive on the number of business clients an FA can manage and FAs are trained on opening business accounts.  Carroll Decl. ¶12.  Chase branches serve business clients and many of them have a business banker devoted to businesses.  Carroll Decl. ¶12.  Some FAs worked with the business banker to generate referrals and otherwise developed business clients.  Forman Decl. ¶16 ("I regularly work with [the business banker] to help develop new business accounts."); Luckett Decl. ¶10; Williams Decl. ¶3.

### 11.     The Varied Experiences Of Financial Advisors Will Require An Individualized Inquiry To Determine Exempt Status.

An FA who spends "very little" time providing financial advice to current clients (Kaufmann Decl. ¶10) is not similarly situated to an FA who spends most of his time doing so (Mavromoustakos Decl. ¶8).  An FA that "prioritize[d] sales over everything else" (Lloyd Decl. ¶11) is not similarly situated to an FA that prioritized the client's interests and provided the best financial advice (Forman Decl. ¶9).  An FA who supervises other employees (Cohen Decl. ¶4) is not similarly situated to an FA who does not (Johnson Decl. ¶22).  An FA whose job "involv[ed] very little relationship-building with

---

[21]     The administrative exemption requires "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers."  29 C.F.R. §541.200(a)(2).  Plaintiffs ignore that the DOL Opinion Letter on financial advisors found that, regardless of the identity of the customer, financial advisors were performing work related to the management or general business operations *of the employer*.  Linthorst Decl. Ex. B (DOL Opinion Letter, at *14-15); *see also* 69 Fed. Reg. 22,122, 22,146 (Apr. 23, 2004) ("The final rule distinguishes the exempt and nonexempt financial services employees based on the duties they perform, not the identity of the customer they serve.").

customers" (Johnson Decl. ¶13), is not similarly situated to an FA who was very involved in relationship-building for significant clients (Forman Decl. ¶¶17-18).  An FA paid $30,000 a year (VanHoogstraat Decl. ¶20) is not similarly situated to an FA paid $100,000, or $300,000, or $800,000 a year (Bibergal Decl. Ex. A).  An FA with an M.B.A. and 20 years of experience (Murray Decl. ¶3) or a Certificate in Financial Planning (Mavromoustakos Decl. ¶2) is not similarly situated to an FA who claims he lacked the expertise to evaluate the advantages and disadvantages of a particular mutual fund (Lloyd Dep. 113:9-20).  An FA that claims he was "closely supervised" (Kaufmann Decl. ¶20) is not similarly situated to an FA subject to only "minimal oversight" (Cholankeril Decl. ¶25).  An FA that "very infrequently" performed work outside the branch (Kaufmann Decl. ¶4) is not similarly situated to an FA that met with clients outside the branch two-to-three times per week, and conducted seminars outside the branch (Ciullo Dep. 119:8-17, 206:22-207:9).  These fundamental differences between Plaintiffs and other FAs will result in different exemptions being applied to Plaintiffs and other FAs, and even common exemptions being applied based on materially different facts, making it inappropriate to proceed collectively.  *Myers*, 624 F.3d at 549.

**E.      Numerous Courts Have Denied Conditional Or Class Certification Of Overtime Claims By Financial Advisors and Others Claiming Misclassification.**

Because adjudication of the merits of the FA overtime claims would necessitate an individualized inquiry, numerous courts have denied class certification of FA overtime claims.  *Drake v. Morgan Stanley & Co.*, 2010 U.S. Dist. LEXIS 47627, at *23-24 (C.D. Cal. Apr. 30, 2010) (denying class certification of FA overtime claims under Rule 23 where there were "'extensive differences in . . . FA job duties, investment philosophies, marketing styles, and other key differences' such that the Overtime Class may similarly not be certified under this rule"); *Handler v. Oppenheimer & Co., Inc.*, Case No. BC 343542 (Cal. Super. Ct. Oct. 9, 2007) (denying class certification of FA overtime claims) (Linthorst Decl. Ex. H); *Ubalde v. Prudential Secs., Inc.*, No. BC245149 (Cal. Sup. Ct. Nov. 1, 2004) (same) (Linthorst Decl. Ex. I); *see also Perry v. U.S. Bank*, 2001 WL 34920473, at

25

*5 (N.D. Cal. Oct. 16, 2001) (denying class certification where duties differed based on the "style of the individual personal banker in offering financial advice and analysis to clients").

Moreover, numerous courts in this Circuit have repeatedly denied certification in misclassification cases where the plaintiffs failed to demonstrate that they and all putative class members were similarly situated. *See, e.g.*, *Vargas*, 2012 U.S. Dist. LEXIS 113993, at *4-5 (denying conditional certification of fund accountants claiming misclassification); *Jenkins v. TJX Cos., Inc.*, 853 F. Supp. 2d 317, 322-23 (E.D.N.Y. 2012) (denying conditional certification of assistant store managers claiming misclassification); *Guillen*, 841 F. Supp. 2d at 803 (same); *Khan v. Airport Mgmt. Servs., Inc.*, 2011 WL 5597371, at *5 (S.D.N.Y. Nov. 16, 2011) (denying conditional certification of warehouse managers claiming misclassification); *Diaz v. Elec. Boutique of Am., Inc.*, 2005 WL 2654270, at *4 (W.D.N.Y. Oct. 17, 2005) (denying conditional certification of store managers claiming misclassification); *Mike*, 274 F. Supp. 2d at 221 (denying conditional certification of claims representatives alleging misclassification).

### F.    None Of The Evidence Or Authority Relied Upon By Plaintiffs Provides A Common Basis To Adjudicate The Overtime Claims Of All FAs.

Exempt Status.  Plaintiffs claim that the mere fact that FAs are classified as exempt satisfies their burden for conditional certification.  Pls' Br. 11-12.  That is not the law, as the decisions in *Vargas*, *Hendricks*, *Jenkins*, *Guillen*, *Khan*, *Diaz*, *Mike*, and other cases make clear.  In fact, in *Myers*, the Second Circuit joined with the Ninth Circuit in declaring that "the fact of common exemption does not establish whether all plaintiffs were *actually* entitled to overtime pay or whether they were covered by the applicable administrative regulations defining FLSA's exemptions."  *Myers*, 624 F.3d at 549 (emphasis in original) (citing *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 958 (9th Cir. 2009)); *see also Jenkins*, 2012 WL 1099964, at *5; *Vasquez v. Vitamin Shoppe Indus. Inc.*, 2011 WL 2693712, at *4 (S.D.N.Y. July 11, 2011).

Job Requisitions.  Plaintiffs rely extensively on a series of job requisitions with an allegedly common job description to show that all FAs and FAAs are "similarly situated."  Pls' Br. 11-12. Significantly, although Plaintiffs claim that their primary duty was selling financial products, this supposed duty does not appear anywhere in the job requisitions, which instead describe exempt financial advisory duties that Plaintiffs disclaim.  Pls' Br. 12-13, Ex. E.  For these reasons, the DOL and numerous courts have made clear that the exempt status must be determined based on the job duties *actually* performed by the individual employee, not the job duties claimed by the employer in the job title or job description.  *See, e.g.*, *Myers*, 624 F.3d at 548; *Khan*, 2011 WL 5597371, at *5 ("To proceed as a collective action . . . 'it is not sufficient for [plaintiff] to show that he and the proposed class operated under the same job description.'") (quoting *Guillen*, 750 F. Supp. 2d at 476).[22]

Case Law.  Plaintiffs rely on two cases that they claim certified collectives of "registered financial services salespeople," neither of which is helpful to Plaintiffs.  Pls' Br. 11.  In *Bouder v. Prudential Financial, Inc.*, 2008 WL 7898281, at *4 (D.N.J. Mar. 27, 2008), the putative class members were "registered insurance salespeople" – not financial advisors subject to FINRA Rules. Moreover, the decision in *In re RBC Dain Rauscher Overtime Litigation*, 703 F. Supp. 2d 910 (D. Minn. 2010), illustrates why conditional certification should be denied.  In ruling on summary judgment, the district court "engage[d] in a painstaking and fact-intensive inquiry with respect to each individual plaintiff's actual, day-to-day work duties in order to determine whether the plaintiff

---

[22]      Plaintiffs cite to one training document that makes reference to "sales" or the "sales process" while ignoring the many training documents that focus on providing suitable financial advice.  Pls' Br. 5.  More importantly, even when, in lay terms, certain documents make reference to "sales," the substance of what is being referred to is the exempt financial advisory process of gathering and analyzing client information, developing recommendations, and reviewing the advantages and disadvantages of each with the client.  Bien Decl. Ex. B, at 18, 21, 24, 25-29.  The fact that lay persons may refer to such duties as "sales" is irrelevant because the DOL has defined such duties as exempt work in the regulations.  29 C.F.R. § 541.203(b). Moreover, as the DOL has stated, "many financial services employees qualify as exempt administrative employees, even if they are involved in some selling to consumers."  69 Fed. Reg. 21,122, 22,146 (Apr. 23, 2004).  If Plaintiffs could show that any particular FA engaged in sales duties, the question would then be how much time did he or she spend on such duties and a consideration of the other factors discussed above. Plaintiffs have offered no common evidence that would resolve these issues for all FAs.

qualifies for the exemption." *Id.* at 969.  As a result, the court denied class certification of the overtime claims under Rule 23.  *Id.*  The overtime claims under the FLSA, however, would be no less "painstaking and fact-intensive" to adjudicate and would not promote judicial efficiency.  *See Espenscheid*, 705 F.3d at 772 ("[T]he provisions of Rule 23 are intended to promote efficiency as well . . . and in that regard are as relevant to collective actions as to class actions.").

### G.    The Court Should Not Send Notice To Those Who Have Arbitration Agreements.

Even if the Court should decide to send notice of this case to anyone, which for the reasons set forth above it should not, the Court should not send notice to those individuals who are parties to arbitration agreements with class waivers in which they have agreed not to file claims in this case.  To do so would be outside the Court's jurisdiction, and contrary to the mandate of the FAA.

The FAA provides a remedy for "[a] party aggrieved" by another's failure to arbitrate, 9 U.S.C. §4, but it turns the FAA on its head for a Court to <u>cause</u> a party to be so aggrieved by soliciting the filing of claims in court that are covered by an arbitration agreement.  As explained above and in Defendant's pending Motions to Compel Arbitration (Dkt. Nos. 65 & 67), the putative class identified by Plaintiffs includes over 2,000 individuals who expressly agreed to arbitrate their claims on an individual basis, and have "waive[d] any right with respect to any Covered Claim to submit, initiate, or participate in any representative capacity or as a plaintiff, claimant or member in a class action, collective action, or other representative or joint action, regardless of whether the action is filed in arbitration or in court."  Isner Decl. ¶3; Emmert Decl. ¶¶6-7 & Exs 1-5, Bibergal Decl. Exs. B-E.  As required by the FAA and Supreme Court decisions, the form of agreement that has been in place for those hired since July 2009 (*see* Emmert Decl. Exs. 2-5) has been enforced in accordance with its terms by numerous courts, including this Court.  *See Ryan*, 2013 U.S. Dist. LEXIS 24628 at *15-16; *Miguel v. JPMorgan Chase Bank, N.A.*, 2013 U.S. Dist. LEXIS 16865 (C.D. Ca. Feb. 5, 2013); *Newhall v. Chase Home Fin. LLC*, 2010 U.S. Dist. LEXIS 144750 (M.D. Fla. Dec. 22, 2010).

Moreover, the sending of notice is a discretionary case management tool for the "efficient resolution in one proceeding of common issues of law and fact," *Hoffman-LaRoche*, 493 U.S. at 170, but nothing under *Hoffman-LaRoche* gives the Court the power to send notice of court litigation to individuals who have contractually agreed not to join the case, or to invite the filing of over 2,000 claims that would need to be litigated individually in a different forum. Inviting the filing of over 2,000 claims to be filed individually in another forum is completely divorced from the Court's discretionary authority to manage <u>this case</u>, and would be contrary to the FAA and concepts of judicial efficiency and fundamental fairness. *See Amicizia Societa Navegazione v. Chilean Nitrate & Iodine Sales Corp.*, 274 F.2d 805, 808 (2d Cir. 1960) ("[T]he court's function in confirming or vacating an arbitration award is severely limited. If it were otherwise, the ostensible purpose for resort to arbitration, i.e., avoidance of litigation, would be frustrated.").

Moreover, to the extent any individual would seek to avoid arbitration on the basis of circumstances individual to him or her, he or she would not be similarly situated to others. Whether each FA entered into an arbitration agreement, when, and whether it is enforceable in the relevant jurisdiction all present unique defenses unsuitable for collective action treatment. *See Clausnitzer v. Fed. Ex. Corp.*, 248 F.R.D. 647, 655 (S.D. Fla. 2008) (denying class treatment because determining the validity of provisions of the purported plaintiffs' agreements was necessarily individualized); *see also Spann v. AOL Time Warner, Inc.*, 219 F.R.D. 307, 319 (S.D.N.Y. 2003).

**H.**      **Any Notice Permitted Should Be Limited.**

Even if the Court were to authorize any notice, which is should not, any such notice should be limited to those who held the FA or FAA role within three years from the date of mailing because, as Plaintiffs concede, "the FLSA's statute of limitations runs until an employee files a consent form," Pls' Br. 9, and the maximum possible statute of limitations is three years, 29 U.S.C. § 255(a). *Whitehorn v. Wolfgang's Steakhouse, Inc.*, 767 F. Supp. 2d 445, 451 (S.D.N.Y. 2011). Notice also

29

should be limited to a single notification sent by U.S. Mail to home addresses.  Plaintiffs request that

individuals be notified of the case <u>eight</u> different ways – home address, telephone, work and home

emails, and then be notified by <u>all</u> such means <u>again</u> through a "reminder" notice.  There is no reason

why a single notification of this case is not adequate, and the multiple notices sought by Plaintiffs

plainly are designed to harass individuals to join the case rather than simply to provide notice.  *See,*

*e.g., Colozzi v. St. Joseph's Hosp. Health Ctr.*, 595 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) ("plaintiffs

have no need for the additional inherently private information sought, including e-mail addresses,

telephone numbers, social security numbers, and dates of birth"); *Witteman v. Wisconsin Bell, Inc.,*

2010 WL 446033, at *3 (W.D. Wis. Feb. 2, 2010) ("the reminder is unnecessary and potentially could

be interpreted as encouragement by the court to join the lawsuit"); *Guzelgurgenli v. Prime Time*

*Specials Inc.*, 883 F. Supp. 2d 340, 358 (E.D.N.Y. 2012) (denying plaintiffs' request to send a

reminder notice).  Defendants also have numerous objections to the proposed notice submitted by

Plaintiffs, and if any notice is authorized, Defendants respectfully request that the parties be ordered to

confer on the notice and submit any disputes to the Court.  *See, e.g., Mendoza v. Casa de Cambio*

*Delgado, Inc.*, 2008 WL 938584, at *4 (S.D.N.Y. Apr. 7, 2008) ("notice should be jointly prepared").

## IV.    CONCLUSION

For all of the foregoing reasons, Plaintiffs have failed their burden to establish that this is an

appropriate case for FLSA certification and to send notice to thousands of FAs nationwide, and

Defendants respectfully request that the Court deny Plaintiffs' motion.

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

Dated:  March 29, 2013          By:    /s/ Sam S. Shaulson
                                       Sam S. Shaulson (SS0460)
                                       101 Park Avenue, New York, New York 10178
                                       *Attorneys for Defendants*

30

## CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2013, I caused a copy of the foregoing Defendants'
Memorandum of Law in Opposition to Plaintiffs' Motion for Conditional Certification and Court-
Authorized Notice Pursuant to Section 216(b) of the FLSA and the Declaration of Thomas A.
Linthorst and accompanying exhibits to be served on the following attorneys for Plaintiffs by
electronic filing:

> Outten & Golden LLP
> Rachel Bien, Esq.
> 3 Park Avenue, 29th Floor
> New York, NY 10016
>
> *Attorney for Plaintiffs*
> Jeffrey Lloyd and Lawrence Kaufmann
>
> Lovell Stewart Halebian LLP
> John Halebian, Esq.
> 317 Madison Avenue – 21st Floor
> New York, NY  10017
>
> *Attorney for Plaintiff*
> Kenneth Ciullo

> /s/ Sam S. Shaulson
> Sam S. Shaulson, Esq.